IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>  )<br>Plaintiff,  )<br>  )<br>vs.  )<br>  )<br>AMANDA R. MULFORD,  )<br>  )<br>Defendant.  )<br>_____) | NO.   CR 07-02065-TUC-FRZ(CRP)<br><br>**REPORT AND RECOMMENDATION<br>ON DEFENDANT'S MOTION TO<br>SUPPRESS** |

    Pending before the Court is Defendant's Motion to Suppress Evidence. (Doc 19). The Government filed its Response and the Defendant filed her Reply. (Docs 23, 26). This Court held an evidentiary hearing on the Motion June 23, 2008 and July 18, 2008. (Docs 30, 38). The Court, having considered the briefing, arguments, and evidence presented, recommends that District Judge Frank R. Zapata, after his independent review and consideration, enter an order **GRANTING** Defendant's Motion to Suppress.

    In the Motion to Suppress, Defendant contends police lacked reasonable suspicion to conduct a stop of the vehicle she was driving. Defendant seeks to suppress all the statements she made subsequent to the illegal stop of her vehicle. The Government contests the Motion, arguing the officer had the requisite reasonable suspicion.

    To support her Motion to Suppress, Defendant called Sergeant Francis Hand, the supervising Tucson Police Department ("TPD") officer to testify. The Government called TPD Officer Michael Johnson and U.S. Marshal Jeffrey Baptista to testify.

**FACTUAL FINDINGS**

At the evidentiary hearing, the Government called TPD Officer Michael Johnson and U.S. Marshal Jeffrey Bapista. Defendant called TPD Sergeant Francis Hand. Officer Johnson testified that he worked for TPD for twelve and a half years and that he was currently assigned to the Gang Tactical Unit. (Transcript from June 23, 2008 Hearing ("TR 1), pp 6-7). Officer Johnson also testified that he was working with the U.S. Marshals and the Fugitive Investigative Strike Team ("F.I.S.T."). (TR 1, pp 6-7). U.S. Marshal Bapista has been a Deputy United States Marshal for seven years. In the evidentiary hearing, he provided testimony regarding F.I.S.T. and its relationship to this case. Sergeant Hand of the TPD was the supervisor of the Gang Tactical Unit on the night and early morning at issue in this case and he was the one who directed Officer Johnson to stop Defendant's vehicle. (TR 2, p 8, 16, 24).

As part of F.I.S.T., Officer Johnson was involved in an ongoing attempt to locate fugitive Richard Shayka ("Shayka"). (TR 1, p 8). The F.I.S.T. surveillance team believed Shayka was associated with or residing at a house located at 5551 East Bellvue. (TR 1, p 10). No evidence was presented through the testimony of Officer Johnson or any other witness to show that Defendant owned, rented, or was even living at the house at 5551 East Bellevue. F.I.S.T. surveillance believed Defendant's vehicle might be connected to Shayka because the surveillance team observed it traveling to and from the 5551 East Bellevue residence earlier in the evening on April 21, 2007.

Because F.I.S.T. surveillance believed there was some connection between Defendant's vehicle and the residence at which Shayka was possibly located, on the night of April 21, 2007 and into the early morning hours of April 22, 2007, Officer Johnson was directed by Sergeant Hand of the TPD to observe Defendant's vehicle. (TR 1, p 15). Significant to Defendant's Motion, when U.S. Marshal Jeffrey Baptista testified, he admitted that the surveillance team had no reason to believe Shayka was traveling in Defendant's vehicle when she traveled to Club Envy on the night in question. (TR 1, p 84). In fact, the surveillance team believed Shayka was at the 5551 East Bellevue residence when Officer

1  Johnson initiated a stop of Defendant's vehicle in the early morning hours of April 22, 2007.
2  (TR 1, p 85).

3  Nevertheless, Officer Johnson maintained surveillance of Defendant's vehicle as it
4  arrived at Club Envy and remained parked there for the night and into the early morning
5  hours of April 22, 2007. (TR1, p 10, 34). At approximately 2:40 a.m. on April 22, 2007,
6  Officer Johnson observed the headlights of Defendant's vehicle turn on and he advised
7  Sergeant Hand that the vehicle was in motion. (TR 1, pp 12, 33). At this point Sergeant
8  Hand directed Officer Johnson to stop Defendant's vehicle. (TR 1, pp 16, 24). Officer
9  Johnson testified he was concerned that Shayka was in the vehicle at the time but as the
10 testimony of Marshal Baptista proves, the surveillance team had no reason to believe Shayka
11 was in the vehicle. (TR 1, pp 84, 85).

12 Officer Johnson conducted the stop and observed a single occupant, Defendant
13 Mulford. (TR 1, p 18). Officer Johnson began the stop by asking Defendant about a shots
14 fired call, which had come across the radio between 2:00 a.m. and 2:30 a.m., about twenty
15 to fifty minutes prior to his stop of the Defendant. (TR 1, p 18-20, TR 2, p 21). Officer
16 Johnson had been watching Club Envy since 2:00 a.m. and did not hear shots fired or see
17 anyone flee the business. (TR 1, p 40). Also, Officer Johnson was not assigned to that call
18 and most importantly, Officer Johnson stopped Defendant's vehicle solely because Sergeant
19 Johnson directed him to do so. (TR 1, pp 39, 16, 24).

20 After Officer Johnson questioned Defendant about the shots fired called, he also told
21 Defendant that "she was not in trouble at this time." (TR 1, p 18-20). He then questioned
22 Defendant about Shayka. (TR 1, pp 18-20). Defendant was cooperative and answered
23 Officer Johnson's questions. (TR 1, pp 19-20). Officer Johnson asked Defendant if she had
24 any information regarding Shayka, to which Defendant replied she did not. (TR 1, p 22).
25 Defendant then asked for Officer Johnson's business card and said she would call him if
26 there was any information she could provide to him. (TR 1, p 22). After Officer Johnson
27 gave Defendant his business card, their conversation ended and she drove away. She was
28 later charged with the crime in this case.

1 **STANDARD FOR REVIEW**

2 The Fourth Amendment prohibits an officer from stopping a vehicle without a
3 reasonable or founded suspicion of criminal conduct at the time of the stop. *United States*
4 *v. Rodriguez*, 976 F.2d 592, 594 (9th Cir.1992). Reasonable suspicion exists when an officer
5 is aware of specific, articulable facts, which together with objective and reasonable
6 inferences, form a basis for suspecting that the particular person to be detained has
7 committed or is about to commit a crime. *United States v. Salinas*, 940 F.2d 393, 394 (9th
8 Cir.1991). The determination whether reasonable suspicion exists must be based on "the
9 totality of the circumstances - the whole picture." *United States v. Cortez*, 449 U.S. 411, 417
10 (1981). The facts are to be interpreted in light of a trained officer's experience, and the
11 whole picture must be taken into account. *United States v. Sokolow*, 490 U.S. 1, 8 (1989).

12 In a motion to suppress the Government bears the burden of proving a warrantless
13 search satisfies the constitutional protections of the Fourth Amendment against unreasonable
14 searches and seizures. *Vale v. Louisiana*, 399 U.S. 30, 34 (1970). To protect against
15 unreasonable searches and seizures the Government must prove probable cause to a judge
16 or magistrate prior to the search or it must prove the warrantless search fell within "a few
17 specifically established and well-delineated exceptions". *Mincey v. Arizona*, 437 U.S. 385,
18 390 (1978).

19 **ANALYSIS**

20 On this issue, the Government has the burden of proof, by a mere preponderance, to
21 establish particularized facts that reasonably support the conclusion that Defendant was
22 engaging in criminal conduct when she was stopped by Officer Johnson. The Government
23 presented testimony that was vague and general, not particularized, and focused its
24 arguments on "facts" concerning Mulford for which no testimony was provided. Based on
25 the evidence presented at the hearing, the Government failed to meet its burden of proof.

26 In the Government's Response to Defendant's Motion to Suppress, the basis for
27 reasonable suspicion is stated at page 5. First, Deputy Marshal Baptista had developed
28 evidence that Shayka "was staying at Defendant's residence". (Response, p. 5). No

1 testimony was ever presented at the evidentiary hearing that Mulford owned, rented, or was
2 even living at the house at 5551 East Bellevue.

3       Second, the Government argues "the officers had reason to believe that Shayka may
4 have been present in the defendant's vehicle". *Id*. It is true that Officer Johnson was
5 concerned that Shayka was in the car. (TR 1, p15). Officer Johnson had witnessed Shayka
6 shoot at police officers attempting to serve an arrest warrant on him, so that extra caution was
7 wise, but there was no suspicion that Shayka was in the red Ford Explorer that night. The
8 belief was that he was in the house on Bellevue. (TR 1, p 84).

9       Finally, the Government argues that the "shots fired" call in the area of Club Envy
10 justified the stop. (Response, p. 5). At the hearing, the Government abandoned this
11 argument. (TR 2, p 41). There was no factual support for the shots fired call being the basis
12 of the stop. The call occurred between 2:00 a.m. and 2:30 a.m. according to Sergeant Hand,
13 twenty to fifty minutes prior to the stop. (TR 2, p 21). Johnson had been watching Club
14 Envy since 2:00 a.m. and did not hear shots fired or see anyone flee the business. (TR 1, p
15 40). Moreover, Johnson was not assigned to that call. (TR 1, p 39). Most importantly, the
16 only reason Johnson pulled over the red Explorer was that Sergeant Hand told him to do so.

17       The first reason asserted by the Government in its Response to support reasonable
18 suspicion was not supported by evidence. The other two reasons asserted by the Government
19 were factually refuted. Because these reasons were not proven, they play no role in the
20 totality of the circumstances analysis.

21       It is clear in this case that Sergeant Hand, not Johnson or Baptista, made the decision
22 to have Johnson pull over Defendant's car. Given that role, it seemed unusual that the
23 Government would not call Sergeant Hand as a witness. However, reflecting on his
24 testimony, it is clear Hand had no information independent of Johnson and Baptista that
25 supported a finding of reasonable suspicion.

26       Johnson's testimony also adds nothing to the reasonable suspicion analysis. He
27 incorrectly assumed the Explorer had traveled to and from the Bellevue house several times
28 that day. (TR 1, p 10). He suspected that Shayka was in Club Envy and the red Explorer,

1   without any basis for that suspicion. (TR 1, p 16). Johnson did have information about
2   Shayka's connection to Club Envy. (TR 1, p 15). However, that night Johnson could not see
3   who was coming or going from Club Envy and who got in the red Explorer at the end of the
4   night. (TR 1, pp 31-32). Johnson's main role was to notify Hand that the red Explorer was
5   moving and to carry out Hand's order to pull it over.

6   The articulable facts to support a finding of reasonable suspicion must come from
7   Deputy Marshal Baptista's testimony. Baptista testified that he had been to "numerous
8   addresses known to be associated with Mr. Shayka", but was unable to locate Shayka at any
9   of those addresses. (TR 1, p 57). On April 21, 2007, Baptista developed information from
10  a source that he utilized the following day. *Id.* All of what the Government presented about
11  the "source" and the "associate" is the following:

> "Information obtained from a reliable source identified an associate of Mr. Shayka, one associate in particular who was particularly close to the fugitive and had frequent contact with that – with the fugitive. Basically we conducted surveillance on this individual and followed him to (5551 East Bellevue)."

*Id.*

The Government provides its own conclusions, with absolutely no information for the Court to use to check those conclusions. What made the source reliable? What information did the source have about the associate? Where did that information come from? The only thing we know from Baptista's testimony is that the source is male. (TR 1, p 57, l. 24).

The prosecutor went on to ask if Deputy Marshal Baptista developed corroborating information. Astonishingly, the inquiry proceeded as follows:

> A (Baptista)    Yes. I was able to corroborate that through independent investigative activity.
>
> Q (by AUSA)    Okay. And once you responded to 5551 East Bellevue, what did you do?

(TR 1, p 58). What independent investigative activity? Fortunately for the Government, defense counsel apparently saw a benefit in filling that hole by establishing that the corroboration was "analysis of cellular phone activity" for which apparently one of the phones was "associated with Richard Shayka". (TR 1, p 77). Associated in what way? The average head of household no doubt is "associated" with four to six cell phones, even though

- 6 -

he or she only uses one.

In argument, the Government emphasizes information about Mulford that was developing over the course of the evening. The following is all the Government presented on this point:

> Q   Through further investigation were you able to find out more about the female who was driving the car?
>
> A   Yes, we were able –
>
> Q   Who you believed it might be?
>
> A   We were able at that point to – to identify her, not positively at that point of course because we had not made contact with her, but we believed her to be Ms. Mulford.
>
> Q   Was that based on information about the residents of the address?
>
> A   That's correct. Information from the residents and from the vehicle, able to determine based upon her appearance, that she was consistent – the person that we saw was consistent with Ms. Mulford.
>
> Q   Had she also – were there records that associated her with that particular Explorer?
>
> A   Yes, there were; indirectly.
>
> Q   Okay. And did you also find out where she was employed?
>
> A   I don't recall at that particular point in time if we were able to verify that she was employed there. I don't – I don't know.

(TR 1, pp 60-61). Again, there is absolutely no specific information about how Mulford is related to either the Bellevue house or the red Explorer or how she was identified.

The most significant information was that Deputy Marshal Baptista saw "an individual in there who was consistent with Mr. Shayka by height and weight and general appearance". (TR 1, p 64). Here again, the Court knows nothing about Mr. Shayka's height and weight concerning whether it is distinctive or average. It seems likely the "associate" from the green sedan went in the house and never left. (TR 1, pp 74-77). It is not known if the associate is consistent with the height, weight, and general appearance of Shayka.

Finally, in a Supplemental Reponse, the Government argued that this was a consensual encounter not requiring probable cause. Here, the Government relies on the cooperative demeanor of the Defendant after she was stopped. Had the officers spoken to

1  Mulford at Club Envy, it could have been a consensual encounter. No doubt that option was
2  prudently delayed for fear of tipping off Shayka. Nonetheless, pulling over a car with lights
3  or sirens in a seizure implicates the Fourth Amendment and is not consensual.

4  The Government had the burden to prove particularized information that established
5  reasonable suspicion that Defendant Mulford was engaging, or about to engage, in criminal
6  conduct when her car was pulled over by police. Instead, the Government presented a case
7  based solely on vague, general, and conclusory statements. This does not satisfy the burden
8  imposed on the Government.

## RECOMMENDATION

It is the recommendation of this Court that District Judge Frank R. Zapata, after his independent review and consideration, enter an Order **GRANTING** Defendant's Motion to Suppress (Doc. 19). Any and all statements Defendant made after Officer Johnson stopped her vehicle should be suppressed.

Pursuant to 28 U.S.C. §636(b)(1)(B), the parties have ten (10) days from the date of this Report and Recommendation to file written objections to these findings and recommendations with the District Court. Any objections filed should be filed as CR 07-02065-TUC-FRZ.

DATED this 17th day of September, 2008.

_____
CHARLES R. PYLE
UNITED STATES MAGISTRATE JUDGE